**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**(Central Division)**

| | |
|---|---|
| **EVELYN SICAN, Individually and as Administrator of the Estate of LUCIANO SICAN-SOLOMAN, KIMBERLY ACOSTA, LUIS SICAN, JASMINE SICAN, and GLENDA SICAN,** | **Case No.** |
| *Plaintiffs* | |
| v. | |
| **JBS S.A., JBS USA FOOD COMPANY, SWIFT PORK COMPANY, JBS LIVE PORK LLC, JOHN DOES 1-3, and JOHN DOES 4-7** | |
| *Defendants* | |

<u>**CIVIL ACTION COMPLAINT**</u>

*Introduction*

1.      This wrongful death and survival action concerns the negligent, reckless, and outrageous conduct of JBS, the largest meat processing company in the world, because it elected to pursue profits over safety during a global pandemic.

2.      On May 28, 2020, Luciano Sican-Soloman died from complications caused by the pandemic virus, COVID-19, at the age of fifty-seven (57).



3.      At the time of his death, Mr. Sican-Soloman was a line worker in the "loin bone" department at the JBS meat processing plant in Ottumwa, Iowa (the "JBS Iowa Plant").

4.      He had worked at the JBS Iowa Plant for nearly twenty-three (23) years.

5.      The JBS Iowa Plant was owned, supervised, and/or controlled by Defendants JBS S.A., JBS USA Food Company, Swift Pork Company, JBS Live Pork LLC, and John Does 1-3 who are hereinafter collectively referred to as the JBS Defendants.

6.      Luciano Sican-Soloman's death was the predictable and preventable result of the JBS Defendants' decisions to ignore worker safety.

7.      The JBS Defendants ignored federal guidance and put plant workers in the crosshairs of a global pandemic.

8.      Despite the known risks regarding COVID-19, the JBS Defendants: (1) failed to provide sufficient personal protective equipment; (2) forced workers to work in close proximity; (3) forced workers to use cramped and crowded work areas, break areas, restrooms, and hallways; (4) discouraged workers from taking sick leave in a manner that caused sick workers to fear losing their jobs; and (5) failed to properly provide testing and monitoring for individuals who have may have been exposed to the virus that causes COVID-19.

9.      Instead, at the facility where Mr. Sican-Soloman worked, JBS incentivized employees not to call out sick in exchange for bonus payments.

10.     During this critical timeframe in May 2020, Mr. Sican-Soloman contracted COVID-19 while working at the JBS Iowa Plant because the JBS Defendants inexplicably failed to take proper safety precautions to protect workers.

11.     By keeping the JBS Iowa Plant open without providing the proper and recommended safety precautions, JBS intentionally misrepresented the safety of the facility to workers, including to Luciano Sican-Solomon.

12.     By choosing profits over safety, JBS demonstrated a reckless disregard to the rights and safety of others, including Luciano Sican-Soloman.

## THE PARTIES

13.     Plaintiff Evelyn Sican is an adult individual and a citizen of the state of Iowa residing at the above captioned address.

14.     Evelyn Sican brings this suit as the Administrator of the Estate of Luciano Sican-Soloman, on her own behalf and on behalf of all statutory beneficiaries.  Evelyn Sican is the daughter of Luciano Sican-Soloman.

15.     On June 15, 2020, Evelyn Sican was duly appointed as the Administrator of the Estate of Luciano Sican-Soloman by the register of wills for Wapello County.

16.     Luciano Sican-Soloman was, at all relevant times, an adult citizen of the state of Iowa residing in Wapello County.

17.     Plaintiff Kimberly Acosta is an adult individual and a citizen of the state of North Carolina residing in Raleigh, North Carolina.  She is the daughter of Luciano Sican-Soloman.

18.     Plaintiff Luis Sican is an adult individual and a citizen of the state of Iowa residing in Ottumwa, Iowa.  He is the son of Luciano Sican-Soloman.

19.     Plaintiff Jasmine Sican is an adult individual and a citizen of the state of Iowa residing in Ottumwa, Iowa.  She is the daughter of Luciano Sican-Soloman.

20.     Plaintiff Glenda Sican is an adult individual and a citizen of the state of Iowa residing in Ottumwa, Iowa.  She is the daughter of Luciano Sican-Soloman.

21.     Defendant, *JBS S.A.*, is a corporation organized and existing under the laws of Brazil, with a principal place of business located at Avenida Brig Faria Lima 2.391 2, Andar Jd Paulistano, Sao Paulo, SP 01452-000 Brazil.

22.     At all times relevant to this cause of action, JBS S.A. was engaged in business within Iowa on a regular, systematic, continuous, and substantial basis.

23.     At all times relevant to this cause of action, JBS S.A. regularly conducted business in Wapello County.

24.     At all relevant times, JBS S.A. was acting by and through its agents, servants and/or employees, who were acting within the course and scope of their agency, service, and employment with JBS S.A.

25.     Defendant, *JBS USA Food Company* ("JBS USA"), is a corporation organized and existing under the laws of the state of Delaware, with a principal place of business located at 1770 Promontory Circle, Greeley, CO 80634.

26.     At all times relevant to this cause of action, JBS USA was engaged in business within Iowa on a regular, systematic, continuous, and substantial basis.

27.     At all times relevant to this cause of action, JBS USA regularly conducted business in Wapello County.

28.     At all relevant times, JBS USA was acting by and through its agents, servants and/or employees, who were acting within the course and scope of their agency, service, and employment with JBS USA.

29.     Defendant, *Swift Pork Company*, is a corporation organized and existing under the laws of the state of Delaware, with a principal place of business located at 1770 Promontory Circle, Greeley, CO 80634.

30.     At all times relevant to this cause of action, Swift Pork Company was engaged in business within the state of Iowa on a regular, systematic, continuous, and substantial basis.

31.     At all times relevant to this cause of action, Swift Pork Company regularly conducted business in Wapello County.

32.     At all relevant times, Swift Pork Company was acting by and through its agents, servants and/or employees, who were acting within the course and scope of their agency, service, and employment with Swift Pork Company.

33.     Defendant, *JBS Live Pork LLC*, is a corporation organized and existing under the laws of the state of Delaware, with a principal place of business located at 1770 Promontory Circle, Greeley, CO 80634.

34.     At all times relevant to this cause of action, JBS Live Pork LLC was engaged in business within Iowa on a regular, systematic, continuous, and substantial basis.

35.     At all times relevant to this cause of action, JBS Live Pork LLC regularly conducted business in Wapello County.

36.     At all relevant times, JBS Live Pork LLC was acting by and through its agents, servants and/or employees, who were acting within the course and scope of their agency, service, and employment with JBS Live Pork LLC.

37.     Defendants John Does 1-3 are currently unidentified affiliates of JBS S.A., JBS USA Food Company, Swift Pork Company, and JBS Live Pork LLC whose identities are currently unknown to Plaintiff despite a reasonable and diligent search.

38.     Defendants *John Does 1-3* were, at all relevant times, involved in the operation, management, and control of the JBS Iowa plant, and were specifically involved in the design, drafting, training, supervision, communication, and implementation of COVID-19 mitigation policies at the JBS Iowa plant.

39.     At all times relevant to this cause of action, John Does 1-3 were engaged in business within Iowa on a regular, systematic, continuous, and substantial basis.

40.     At all times relevant to this cause of action, John Does 1-3 regularly conducted business in Wapello County.

41.     At all relevant times, John Does 1-3 were acting by and through its agents, servants and/or employees, who were acting within the course and scope of their agency, service, and employment with John Does 1-3.

42.     Defendants *John Does 4-7* are currently unidentified co-worker supervisors of Luciano Sican-Soloman whose identities are currently unknown to Plaintiff despite a reasonable and diligent search.

43.     Defendants John Does 4-7 were, at all relevant times, involved in the operation, management, and control of the JBS Iowa plant, and were specifically involved in the design, drafting, training, communication, and implementation of COVID-19 mitigation policies at the JBS Iowa plant.

44.     Defendants John Does 4-7 were Luciano Sican-Soloman's supervisors at the JBS Iowa Plant.

45.    Defendants JBS S.A., JBS USA Food Company, Swift Pork Company, JBS Live Pork LLC, John Does 1-3, and John Does 4-7 are hereinafter collectively referred to as the JBS Defendants.

## Jurisdiction and Venue

27.    This Court has subject matter jurisdiction over Plaintiffs' action pursuant to U.S.C. § 1332(a) as the amount in controversy exceeds the jurisdictional threshold, exclusive of costs, is between citizens of different states, and because the Defendants each have certain minimum contacts with the State of Iowa such that the maintenance of the suit in this district does not offend traditional notions of fair play and substantial justice.

28.    Venue is proper in the United States District Court for the Southern District of Iowa (Central Division) pursuant to U.S.C. § 1391 as the events giving rise to this claim occurred in and around Wapello County, Iowa.

29.    Upon information and belief, at all times material hereto, Defendants owned, operated, managed, controlled, and oversaw the JBS meatpacking plant located in Ottumwa, Wapello County, Iowa.

## FACTS

### *A Global Pandemic*

32.    COVID-19 is an infectious respiratory disease which is caused by a virus known as "the novel coronavirus."

33.    The virus which caused COVID-19 is highly contagious.

34.    The virus spreads mainly person-to-person, primarily through coughs or sneezes from an infected person in close proximity to another.

35.     The virus is especially dangerous because it can be spread by people who are asymptomatic or pre-symptomatic.

36.     For these reasons, the preferred mechanism to combat the virus has been widespread "stay-at-home" orders to prevent being exposed to the novel coronavirus.

37.     On January 21, 2020, the United States reported its first case of the novel coronavirus.

38.     By this time, it was widely reported that the virus had already spread across Asia and Europe.

39.     On January 30, 2020, the United States reported its first case of COVID-19 acquired via community spread.

40.     In this context, it has been stated that "community spread" means "that people have been infected with the virus in an area, including some who are not sure how or where they became infected."

41.     On January 31, 2020, the World Health Organization ("WHO") declared COVID-19 a "public health emergency of international concern."

42.     On March 9, 2020, with over 500 COVID-19 infections in the United States, the CDC published federal guidelines for workers.

43.     These guidelines included recommendations for social distancing of at least 6 feet, and the use of Personal Protective Equipment ("PPE") for workers.

44.     The same day, March 9, 2020, OSHA released its own guidelines, recommending that companies should offer surgical masks or respirators to workers who could be infected with COVID-19, especially those that worked in close quarters:

> **Personal Protective Equipment (PPE)**
>
> Employers are obligated to provide their workers with PPE needed to keep them safe while performing their jobs. The types of PPE required during a COVID-19 outbreak will be based on the risk of being infected with SARS-CoV-2 while working and job tasks that may lead to exposure.

*OSHA "Guidance on Preparing Workplaces for COVID-19," March 9, 2020*

45.     Despite the clear danger that COVID-19 posed for its workers, Defendants maintained their 'work-while-sick' policy, which they had established years prior to the COVID-19 pandemic to strike fear into employees who had fallen ill and needed time off to recuperate.

46.     Defendants enforced this work-while-sick policy by creating a points system: arbitrarily deducting points for demerits, including taking time off, regardless of the fact that the employee was sick.

47.     Defendants perpetuated this work-while-sick policy by refusing to give workers paid sick leave and giving them an extra six hundred (600) dollars for not missing more than two (2) days of work.

### *Meat Processing Plants – A Hotbed for Viral Infections*

48.     Meat processing plants are known to be "notoriously dangerous."

49.     Meatpacking plants present unique safety issues because of the proximity within which employees work ("elbow-to-elbow") using cutting tools and in a challenging environment.

50.     In 2009, the spread of the H1N1 virus put meat processing plants on notice of the dangerous conditions that the spread of airborne virus posed to their workers.

51.     As recently as 2016, regulations were promulgated to promote worker's safety to protect against airborne illness at the plants.

52.     The enhanced coverage of meat processing plants that has occurred as a result of the COVID-19 pandemic highlighted the pre-existing dangerous conditions which workers were exposed to at these plants.

53.     One report quotes plant workers as stating that "we're modern slaves."

54.     Others have been quoted as stating that "the workers are being sacrificed" in recent media coverage.

55.     Meat processing plants pose specific challenges regarding physical distancing of workers that the Defendants needed to assess and accommodate before allowing work to continue.

56.     Meat processing plants, and the above-named Defendants, were on notice of how at-risk their workers would be in the face of a pandemic like that currently gripping the world.

57.     During the Bush administration, federal agencies informed meatpacking companies that, in the case of a global pandemic, as many as 40% of their workers could be felled by illness or quarantine.

58.     In 2009, the Labor Department also warned that businesses, like meatpacking plants, with "high population density work environments" should stockpile PPE like masks sufficient for each worker to have two masks per day for 120 days.

59.     But a 2015 federal report indicated that the food and agriculture industry, including the meatpacking industry, had "no overarching plan" to deal with a global pandemic.

60.     In fact, industry insiders report that the meatpacking industry rejected offers for pandemic emergency plans and leadership training sessions, throwing caution to the wind and risking the lives of their workers, despite the known fatal risk that a global pandemic posed to those like Mr. Sican-Soloman.

61.     Reports from government health officials make clear that due to strict attendance requirements at meatpacking plants, workers like Mr. Sican-Soloman were either explicitly or implicitly encouraged to work while sick, leading to far wider spread infections.

62.     Recent research from University of Chicago's Booth School of Business indicates that "as many as one in 12 cases of Covid-19 in the early stage of the pandemic in the U.S. can be tied to outbreaks at meatpacking plants," an unsurprising figure given the Defendants' absolute lack of regard for worker safety or infection-resistance protocols.

63.     That number has steadily increased over time, and tragically, Luciano Sican-Soloman 's death was not the last.

### *The JBS Defendants*

64.     JBS, a multinational corporation, is the world's largest meat processor.

65.     JBS beef products fill the shelves of grocery stores across the United States.

66.     With such an important role in the food supply chain, safety should be of paramount concern to JBS.

67.     However, based upon publicly available information, JBS has consistently placed profits over safety.

68.     A review of OSHA statistics for 14,000 participating companies described "17,533 incidents of the most severe work-related injuries ['work-related amputations or hospitalizations'] during the period from January 2015 through September 2016."

69.     JBS had the sixth (6th) most severe injuries reported from that survey.

### *The JBS Iowa Plant*

70.     In 1997, Luciano Sican-Soloman started working at the JBS Plant in Ottumwa, IA.

71.     The JBS Iowa Plant has approximately over 1,000 employees and specializes in pork processing and packaging.

72.     Everyday hundreds of workers report to the plant floor for work in close proximity involving extremes of temperature, dampness, and hazardous footing.

73.     Workers stand only a few feet apart and, because of the volume of the machines at the JBS Iowa Plant, are required to stand within inches of each other to communicate.

74.     Based upon information and belief, the culture at JBS Iowa Plant and its no paid sick leave policy resulted in workers arriving for their shifts while sick for fear of losing their jobs or their paychecks.

75.     As discussed above, Defendants enforced and maintained this work-while-sick policy by employing a points system, deducting points from workers who needed to take sick leave, and refusing to give paid sick leave.

76.     Based upon information and belief, requests for sick leave were sometimes met by the Defendants with threats of termination and without proper regard for the dangers posed by the pandemic.

77.     Based upon information and belief, the culture at the JBS Iowa Plant caused workers to come into work while sick in March of 2020 for fear of losing their job.

78.     The March 9, 2020, OSHA guidance specifically instructed workplaces to send sick workers home:

*OSHA "Guidance on Preparing Workplaces for COVID-19," March 9, 2020*

79.     Despite the skyrocketing risk of COVID-19 infections for workers, the JBS Defendants ignored the safety of workers and required them to report for duty each day in cramped conditions and without adequate PPE.

80.     Despite these known risks, the JBS Defendants refused to close their plants or otherwise limit the number of workers reporting for duty each day.

81.     Based upon information and belief, during the critical phase of the pandemic in 2020, and leading up to Luciano Sican-Solomon's infection and eventual death, the JBS Defendants instructed workers at the JBS Iowa Plant not to wear masks.

82.     The JBS Defendants failed or refused to have workers take their own temperatures at home and before arriving to work, in order to reduce the risk of spreading COVID-19.

83.     The JBS Defendants failed to adequately enforce temperature checks, failed to have someone stationed at the entrance taking temperatures at all hours, and failed to prevent workers from entering the facility without having their temperature checked.

84.     The JBS Defendants failed or refused to consider the health of workers at high risk for contracting COVID-19, and instead placed them on the front lines and in harm's way.

85.     The JBS Defendants failed or refused to sanitize testing equipment.

86.     The JBS Defendants failed or refused to enforce mask wearing policies.

87.     The JBS Defendants failed or refused to enforce social distancing policies.

88.     Based upon information and belief, workers were outspoken about the lack of safety equipment at the Plant.

89.     Based upon information and belief, prior to Mr. Sican-Soloman becoming infected with COVID-19 while working at the JBS Iowa Plant, several of his co-workers at the JBS Iowa Plant became infected with COVID-19.

90.     These co-workers were in close proximity and/or were close contacts with Mr. Sican-Solomon leading up to his infection and eventual death.

91.     Based upon information and belief, Defendants knew that these co-workers had become infected with COVID-19 and had interacted with other co-workers at the Plant who had already been infected and/or unknowingly exposed to COVID-19 due in large part to the deliberate poor dissemination of positive tests amongst workers by the JBS Defendants.

92.     Based upon information and belief, the JBS Defendants never informed employees about their co-workers testing positive for COVID-19 prior to Mr. Sican-Soloman contracting the virus.

93.     Defendants never informed Mr. Sican-Solomon that his co-workers had become infected with COVID-19 and that he may be at increased risk for COVID-19 infection as a result of working in proximity to and/or being in close contact with those individuals.

94.     Based upon information and belief, Defendants took no steps to warn or protect other workers at the Plant from the risk of COVID-19 infection spreading.

### *COVID-19 Infections at all JBS Plants*

95.     COVID-19 spread quickly through the JBS Defendants' meat packing plants.

96.     Despite the clear and present danger the virus presented, JBS Defendants kept their facilities across the United States open or shuttered them only temporarily, even after hundreds of workers fell ill and others died.

97.    Based upon information and belief, the JBS Defendants had a 'work while sick' policy.

98.    The JBS Defendants did not require workers experiencing COVID-19 symptoms to report their illness to their superiors.

99.    The JBS Defendants did not require these workers to self-quarantine at home, despite federal guidance to the contrary.

100.    In a demonstration of placing profits over safety, the JBS Defendants ignored the health of their vulnerable workers and did not shut any plants despite a mountain of evidence of a public safety concern of unforeseen magnitude.

101.    JBS operates scores of meat processing plants nationwide.

102.    JBS USA has experienced COVID-19 outbreaks at least at eight (8) of those plants; Souderton, Pennsylvania; Greeley, Colorado; Plainwell, Michigan; Green Bay, Wisconsin; Cactus, Texas; Worthington, Minnesota; Ottumwa, Iowa; and Grand Island, Nebraska.

103.    On April 14, 2020, JBS USA had to shut down the facility in Greeley, CO because of the coronavirus outbreak.

104.    "While the Greeley beef facility is critical to the U.S. food supply and local producers, the continued spread of coronavirus in Weld County requires decisive action," said Andre Nogueira, CEO of JBS USA.

105.    However, according to media reports, despite experiencing "increased absenteeism" at other plants, JBS continued to operate "the majority of its facilities across the country at or near capacity."

106.    A simultaneously released statement on behalf of JBS addressed absenteeism as follows: "When COVID-19 is prevalent in the community, fear is heightened, absenteeism rises,

and the challenge of keeping the virus out becomes greater . . . when absenteeism levels become too high, facilities cannot safely operate."

### The JBS Defendants Had Control Over the COVID-19 Mitigation Policies and Procedures at the Iowa Plant

107.    Defendant JBS S.A. devised, drafted, created, disseminated, and oversaw COVID-19 mitigation policies and procedures at the JBS Iowa Plant.

108.    Defendant JBS USA Food Company devised, drafted, created, disseminated, and oversaw COVID-19 mitigation policies and procedures at the JBS Iowa Plant.

109.    Defendants JBS S.A. and JBS USA Food Company, through their CEOs Gilberto Tomazoni and Andre Nogueira, drafted, created, disseminated, and oversaw COVID-19 mitigation policies and procedures at the JBS Iowa Plant.

110.    Beginning in February of 2020, JBS S.A. and JBS USA Food Company began disseminating these policies and procedures to the respective plants, including the JBS Iowa Plant.

111.    JBS S.A. and JBS USA Food Company directed workers at their plants, including the JBS Iowa Plant, that the guidelines were mandatory and must be followed.

112.    In other words, JBS S.A. and JBS USA Food Company directly asserted control over these policies and procedures – and their implementation – at all plants in the United States, including the JBS Iowa Plant.

113.    In March of 2020, JBS USA Food Company CEO Andre Nogueira specifically directed all JBS plants, including the JBS Iowa Plant, to train supervisors on COVID-19, symptoms of respiratory illness, and plant supervisor responsibilities regarding COVID-19 mitigation efforts.  In other words, JBS USA Food Company, through its CEO, controlled and oversaw the implementation of COVID-19 mitigation policies and procedures at the JBS Iowa Plant.

114.    In February and March of 2020, JBS S.A. and JBS USA Food Company created a Coronavirus Crisis Committee.  That Committee created, drafted, edited, oversaw, and supervised COVID-19 mitigation policies and procedures at all JBS plants, including the JBS Iowa Plant.

### *The House Subcommittee Report*

115.    On May 12, 2022, the U.S. House Subcommittee on the Coronavirus Crisis released a Report detailing the egregious, reckless conduct of meatpacking companies, including the JBS Defendants.  See Exhibit A.

116.    In relevant part, the Committee determined:

    a.    "Meatpacking executives were aware of the high risks of coronavirus transmission inside of plants."

    b.    "When workers were afraid to report to work because of the lack of coronavirus precautions and high infection rates in plants, meatpacking companies [including JBS's CEO] and USDA jointly lobbied the White House to dissuade workers from staying home or quitting."

117.    The Report specifically notes that "a JBS executive received an April 2020 email from a doctor in a hospital near JBS' Cactus, Texas facility saying '100% of all COVID-19 patients we have in the hospital are either direct employees or family member[s] of your employees,' and warning that 'your employees will get sick and may die if this factory continues to be open.'"

118.    That email is included in full below:



119.    Importantly that email was received by JBS **before Luciano Sican-Soloman contracted COVID-19 at the JBS Iowa plant**.

120.    Five days later, on April 23, 2020, the Mexican Consulate of Omaha, Nebraska emailed a JBS human resources director expressing concern on behalf of workers at JBS's Iowa meatpacking facilities.

121.    The Consulate's email noted that the Iowa meatpacking facilities featured "sanitary measures" that were "far from ideal, including that [workers] continue to work should to shoulder on a production line that does not slow down and the use of masks is still optional."

122.    The JBS employee responded: "My corporate team will not press this request" and noted "I personally do not want to be in contact" with the consulate on this issue.

123.    In other words, JBS ignored this warning, received prior to Luciano Sican-Soloman's infection and death, that put JBS on notice of the dangerous conditions at its Iowa meatpacking plants, including the plant in which Luciano Sican-Soloman became infected.

124.     In other words, Defendants had actual notice that COVID-19 was being spread at meatpacking plants like the Iowa plant, had actual notice that meatpacking plants like the Iowa plant were hotbeds for the virus, and had actual notice that if the plants did not shut down and/or if preventative measures were not taken, workers would contract COVID-19 at work and die.

125.     That is precisely what happened to Luciano Sican-Soloman.   His death was preventable and foreseeable.   But in reckless disregard for his life, Defendants chose not to take preventative measures and chose to keep the Iowa plant open.   Luciano Sican-Soloman was sacrificed by the JBS Defendants in further pursuit of profits.

### *The Death of Luciano Sican-Soloman*

126.     Based upon information and belief, to the extent any safety measures at all were promulgated at the JBS Iowa Plant, they were not enforced, including a failure to enforce mask-wearing, a failure to enforce social distancing, and a failure to disseminate safety and health information by the supervisors of the plant.

127.     Based upon information and belief, workers at JBS Iowa were not required to report to their superiors if they were experiencing COVID-19 symptoms.

128.     Based upon information and belief, when Luciano Sican-Soloman last arrived for work at the JBS Iowa Plant, a number of workers at the JBS Iowa Plant had already become infected.

129.     Based upon information and belief, prior to Luciano Sican-Soloman contracting COVID-19 at the JBS Iowa Plant, the JBS Defendants were tracking the number of workers at the plant whom JBS suspected had COVID-19 and those whom JBS *knew* had COVID-19.

130.     Based upon information and belief, prior to Luciano Sican-Soloman contracting COVID-19 at the JBS Iowa Plant, the JBS Defendants kept this information hidden and concealed from workers at the plant, including Luciano Sican-Soloman.

131.     Based upon information and belief, prior to Luciano Sican-Soloman contracting COVID-19 at the JBS Iowa Plant, and despite knowing the dozens of workers at the plant were both suspected COVID-19 positives and confirmed COVID-19 positive, the JBS Defendants intentionally misrepresented to workers at the plant that it was safe to come to work and that the likelihood of contracting COVID-19 at work was relatively slim, if not impossible.

132.     Based upon information and belief, prior to Luciano Sican-Soloman contracting COVID-19 at the JBS Iowa Plant, and despite knowing the dozens of workers at the plant were both suspected COVID-19 positives and confirmed COVID-19 positive, the JBS Defendants failed to implement appropriate contact tracing procedures to help curb the spread of COVID-19 at the Plant.

133.     Based upon information and belief, prior to Luciano Sican-Soloman contracting COVID-19 at the JBS Iowa Plant, the JBS Defendants knew that there was an outbreak of COVID-19 at the plant.

134.     Based upon information and belief, prior to Luciano Sican-Soloman contracting COVID-19 at the JBS Iowa Plant, and despite knowing the dozens of workers at the plant were both suspected COVID-19 positives and confirmed COVID-19 positive, the JBS Defendants refused to shut down the plant.

135.     The JBS Defendants put profits over safety, and over the lives of plant workers like Luciano Sican-Soloman.

136.    On May 6, 2020, Luciano Sican-Soloman received a positive COVID-19 test—Luciano Sican-Soloman contracted COVID-19 while at the JBS Iowa Plant.

137.    Shortly after he tested positive, Luciano Sican-Soloman was hospitalized at Ottumwa Regional Health Center.

138.    On May 12, 2020, Luciano Sican-Soloman was transferred to the Iowa Methodist Medical Center for further treatment of COVID-19.

139.    Over the next few weeks, Luciano Sican-Soloman 's condition continued to worsen.

140.    On May 28, 2020, Luciano Sican-Soloman lost his battle with the virus; his death certificate lists his cause of death as COVID-19.

141.    Mr. Sican-Soloman 's death was the predictable and preventable result of the JBS Defendants' failures to consider the safety of their workers.

142.    The Defendants knew, or in the exercise of a reasonable degree of care, should have known that if OSHA and CDC guidance were not followed, workers would become infected with and could succumb to COVID-19.

143.    Instead, the JBS Defendants placed profits over safety.

144.    As a result of the JBS Defendants' outrageous, reckless, and grossly negligent actions which demonstrated a total disregard for the workers' safety, Luciano Sican-Soloman became infected with COVID-19 at JBS Iowa.

145.    The JBS Defendants actions demonstrated a knowing willingness to sacrifice the health of Mr. Sican-Soloman and others for its own corporate greed.

146.    Defendants, JBS S.A., JBS USA Food Company, and Swift Pork Company by and through their agents, servants, and/or employees, collectively and individually made decisions related to worker health, safety, protection, and sanitation in light of the COVID-19 pandemic.

147.     As a direct result of the carelessness, negligence, recklessness, gross negligence, and/or other liability producing conduct of the Defendants, Plaintiff's decedent, Luciano Sican-Soloman, suffered illness and injuries that led to his death.

148.     Mr. Sican-Soloman sustained conscious pain and suffering, and fear of impending death.

149.     Mr. Sican-Soloman sustained a permanent loss of earnings and loss of earning capacity.

150.     Mr. Sican-Soloman sustained permanent loss of enjoyment of life, loss of life's pleasures, and loss of life's hedonic pleasures.

151.     Mr. Sican-Soloman has been permanently prevented from performing all his usual duties, occupations, recreational activities, and avocations, all to his and his beneficiaries' loss and detriment.

152.     The outrageous conduct described herein warrants the imposition of punitive damages to deter the JBS Defendants and meat processing plants that operate in Iowa and across the country from placing profits over the safety of their workers, their workers' families, and the public at large.

### COUNT I
### NEGLIGENCE (AGAINST DEFENDANT SWIFT PORK COMPANY)

153.     Plaintiffs hereby incorporate all preceding paragraphs of this Complaint by reference.

154.     At all relevant times, Swift Pork Company owned, operated, maintained, and otherwise controlled the JBS Iowa Plant, and controlled and supervised the work being done at the JBS Iowa Plant.

155.    At all relevant times, Swift Pork Company employed supervisors in managerial capacities to oversee other employees at the JBS Iowa Plant.

156.    At all relevant times, the Swift Pork Supervisors were within the scope and course of their employment at Swift Pork Company.

157.    The Swift Pork Supervisors knew that failing to take the appropriate safety precautions would likely result in the spread of COVID-19 at the Plant.

158.    The Swift Pork Supervisors knew that COVID-19 infections and resulting illnesses and/or death were probable as a result of their conduct.

159.    Despite recognizing the danger of COVID-19, the Swift Pork Supervisors consciously failed to avoid the danger posed by COVID-19.

160.    The gross negligence, carelessness, and recklessness of Swift Pork Company, their supervisors, agents, and/or employees, which were the cause of Luciano Sican-Soloman's death, consisted of, but was not limited to the following:

   a.   Ignoring the risk of COVID-19 infection to workers at the JBS Iowa Plant;

   b.   Failing to provide workers with any equipment to help prevent the spread of COVID-19 at the JBS Iowa Plant;

   c.   Intentionally ignoring the fact that workers at the JBS Iowa Plant were infected with and/or were displaying symptoms consistent with COVID-19;

   d.   Failing to provide appropriate PPE at the JBS Iowa Plant;

   e.   Failing to provide workers with any equipment to help prevent the spread of COVID-19 at the JBS Iowa Plant;

   f.   Ignoring federal guidance from the CDC and OSHA by not mandating the use of masks and PPE at the JBS Iowa Plant;

g.  Ignoring federal guidance from the CDC and OSHA by not mandating and/or enforcing social distancing guidelines at the JBS Iowa Plant;

h.  Ignoring federal guidance from the CDC and OSHA by not mandating that workers who were feeling ill report their symptoms to their superiors;

i.  Ignoring federal guidance from the CDC and OSHA by not mandating that workers who were feeling ill stay home from work and self-quarantine;

j.  Requiring workers to stand less than 6 feet apart;

k.  Failing to implement policies and procedures that mandated workers kept 6 feet apart;

l.  Failing to provide workers with masks and/or PPE;

m.  Failing to provide workers with clear guidelines for social distancing;

n.  Failing to reduce the numbers of workers per shift at the JBS Iowa Plant, despite the fact that the Swift Company Supervisors knew, or should have known, that workers in close proximity to one another were more prone to infection;

o.  Enforcing and/or maintaining a formal and/or informal 'work while sick' policy at the JBS Iowa Plant;

p.  Failing to properly sanitize or otherwise disinfect the JBS Iowa Plant, despite the fact that workers at the plant were falling ill;

q.  Failing to perform temperature checks on workers arriving at the JBS Iowa Plant before they were allowed inside the Plant;

r.  Violating federal and state guidelines and requirements related to COVID-19 prevention in the workplace;

s.  Violating OSHA regulations, including OSHA 1910.132, related to the use of PPE;

t.   Failing to provide Luciano Sican-Soloman with a safe place to work;

u.   Allowing workers at the JBS Iowa Plant, including Luciano Sican-Soloman, to become infected by COVID-19 while working at the Plant;

v.   Failing to properly train and supervise their employees and employees of subcontractors about the danger posed by COVID-19 and the necessary methods to prevent infection;

w.   Failing to properly train and supervise their employees and employees of subcontractors about federal and state guidelines regarding COVID-19 and federal and state guidelines to prevent COVID-19 infection;

x.   Failing to warn Luciano Sican-Soloman and other workers at the JBS Iowa Plant of the danger posed by COVID-19;

y.   Failing to adopt, enact, employ, and enforce proper and adequate safety programs, precautions, procedures, measures, and plans;

z.   Failing to provide workers with safety equipment;

aa.  Failing to provide workers with adequate safety equipment;

bb.  Failing to properly supervise and inspect the work being done at the JBS Iowa Plant;

cc.  Failing to prevent workers at the JBS Iowa Plant from being infected by COVID-19.

dd.  Failing to implement proper policies and/or procedures for shutting the JBS Iowa Plant down in the face of widespread virus/pandemic;

ee.  Failing to properly consider the safety of members of the public that would come into contact with those who worked at the facility; and

ff.   Failure to express due care under the circumstances described herein.

161.   The Defendants' actions and/or inactions were substantial factors and/or factual causes and/or increased the risk of harm to Plaintiff's decedent.

162.   The acts and omissions set forth herein were done in a grossly negligent, willful, reckless, and wanton fashion with a conscious indifference to the rights of members of the public generally, and Plaintiffs' decedent in particular.

## COUNT II
## NEGLIGENCE (AGAINST THE JBS DEFENDANTS)

163.   Plaintiffs hereby incorporate all preceding paragraphs of this Complaint by reference.

164.   At all relevant times, the JBS Defendants owned, operated, maintained, and otherwise controlled the JBS Iowa Plant, and controlled and supervised the work being done at the JBS Iowa Plant.

165.   Specifically, the JBS Defendants controlled and supervised all safety precautions and procedures at JBS Iowa Plant, including those related to COVID-19 protection and prevention.

166.   Control over the operations and safety decisions at the JBS Iowa Plant were not limited to Swift Pork Company. Instead, key decisions were controlled by corporate representatives at the parent level.

167.   The specific decisions related to whether or not to provide PPE, whether or not to properly distance workers, and whether or not to take other measures to prevent the spread of COVID-19 at the JBS Iowa Plant were controlled by the corporate leaders in Colorado and Brazil.

168.   In connection with their control and supervision of the JBS Iowa Plant, the JBS Defendants developed plans, recommendations, guidance, and safety procedures and specifications for performance of work at the JBS Iowa Plant.

169.    The JBS Defendants, having possession and control of the JBS Iowa Plant and the work being done there, owed a duty to all those working at the JBS Iowa Plant, including Luciano Sican-Soloman, a business invitee, to provide a reasonably safe work environment, free from unreasonable and dangerous hazards.

170.    The negligence, gross negligence, carelessness and recklessness of the JBS Defendants, their agents, servants, and/or employees, which were the cause Luciano Sican-Soloman 's death, consisted of, but was not limited to, the following:

   a.   Ignoring the risk of COVID-19 infection to workers at the JBS Iowa Plant;

   b.   Failing to provide workers with any equipment to help prevent the spread of COVID-19 at the JBS Iowa Plant;

   c.   Intentionally ignoring the fact that workers at the JBS Iowa Plant were infected with and/or were displaying symptoms consistent with COVID-19;

   d.   Failing to provide appropriate PPE at the JBS Iowa Plant;

   e.   Failing to provide workers with any equipment to help prevent the spread of COVID-19 at the JBS Iowa Plant;

   f.   Failing to close the JBS Iowa Plant, despite the fact that the JBS Defendants knew, or should have known, that workers at the plant were suffering from COVID-19;

   g.   Failing to close the JBS Iowa Plant, despite the fact that the JBS Defendants knew, or should have known, that workers at the plant were suffering from symptoms consistent with COVID-19;

   h.   Ignoring federal guidance from the CDC and OSHA by not mandating the use of masks and PPE at the JBS Iowa Plant;

i.  Ignoring federal guidance from the CDC and OSHA by not mandating and/or enforcing social distancing guidelines at the JBS Iowa Plant;

j.  Ignoring federal guidance from the CDC and OSHA by not mandating that workers who were feeling ill report their symptoms to their superiors;

k.  Ignoring federal guidance from the CDC and OSHA by not mandating that workers who were feeling ill stay home from work and self-quarantine;

l.  Requiring workers to stand less than 6 feet apart;

m. Failing to implement policies and procedures that mandated workers kept 6 feet apart;

n.  Failing to provide workers with masks and/or PPE;

o.  Failing to provide workers with clear guidelines for social distancing;

p.  Failing to reduce the numbers of workers per shift at the JBS Iowa Plant, despite the fact that the JBS Defendants knew, or should have known, that workers in close proximity to one another were more prone to infection;

q.  Refusing to close the JBS Iowa Plant entirely, even though the JBS Defendants knew workers at other JBS Plants across the country had come infected with COVID-19;

r.  Enforcing and/or maintaining a formal and/or informal 'work while sick' policy at the JBS Iowa Plant;

s.  Failing to properly sanitize or otherwise disinfect the JBS Iowa Plant, despite the fact that workers at the plant were falling ill;

t.  Failing to perform temperature checks on workers arriving at the JBS Iowa Plant before they were allowed inside the JBS Iowa Plant;

u.  Violating federal and state guidelines and requirements related to COVID-19 prevention in the workplace;

v.  Violating OSHA regulations, including OSHA 1910.132, related to the use of PPE;

w.  Failing to provide Luciano Sican-Soloman with a safe place to work;

x.  Allowing workers at the JBS Iowa Plant, including Luciano Sican-Soloman, to become infected by COVID-19 while working at JBS Iowa Plant;

y.  Failing to properly train and supervise their employees and employees of subcontractors about the danger posed by COVID-19 and the necessary methods to prevent infection;

z.  Failing to properly train and supervise their employees and employees of subcontractors about federal and state guidelines regarding COVID-19 and federal and state guidelines to prevent COVID-19 infection;

aa. Failing to warn Luciano Sican-Soloman and other workers at the JBS Iowa Plant of the danger posed by COVID-19;

bb. Failing to adopt, enact, employ, and enforce proper and adequate safety programs, precautions, procedures, measures, and plans;

cc. Failing to provide workers with safety equipment;

dd. Failing to provide workers with adequate safety equipment;

ee. Failing to properly supervise and inspect the work being done at the JBS Iowa Plant;

ff. Failing to prevent workers at the JBS Iowa Plant from being infected by COVID-19.

gg. Failing to properly train supervisors and managers in determining when to shut down the plant due to a safety concerns;

hh. Failing to provide proper training on how to combat an airborne virus;

ii.  Failing to hire and/or select appropriate individuals for managerial positions;

jj.  Failing to conduct appropriate safety surveys of the JBS Iowa Plant;

kk. Failing to hire appropriate consultants for how to respond to an airborne virus;

ll.  Failing to timely obtain appropriate PPE materials to protect workers.

mm.       Failing to implement proper policies and/or procedures for shutting the JBS Iowa Plant down in the face of widespread virus/pandemic;

nn. Failing to properly consider the safety of members of the public that would come into contact with those who worked at the facility; and

oo. Failure to express due care under the circumstances described herein.

171.    The Defendants' actions and/or inactions were substantial factors and/or factual causes and/or increased the risk of harm to Plaintiffs' decedent.

172.    The acts and omissions set forth herein were done in a negligent, grossly negligent, willful, reckless, and wanton fashion with a conscious indifference to the rights of members of the public generally, and Plaintiffs' decedent in particular.

## COUNT III
## FRAUDULENT MISREPRESENTATION (AGAINST THE JBS DEFENDANTS)

173.    Plaintiffs hereby incorporate all preceding paragraphs of this Complaint by reference.

174.    The JBS Defendants owed lawful business invitees at the JBS Iowa Plant, including Luciano Sican-Soloman, the highest duty of care.

175.    The JBS Defendants knew that workers at the JBS Iowa Plant had become infected with COVID-19, and/or were displaying symptoms consistent with COVID-19.

176.    The JBS Defendants knew that workers at the JBS Iowa Plant were especially susceptible to COVID-19, and knew that once one worker was infected, the virus was likely to spread to others.

177.    Despite this knowledge, the JBS Defendants did not warn workers that others at the JBS Iowa Plant had become infected with COVID-19 and/or were displaying symptoms consistent with COVID-19.

178.    Despite this knowledge, the JBS Defendants directly misrepresented to workers that there was no risk of infection and/or that the workers were unlikely to become infected and/or deliberately withheld their knowledge of workers at the Plant becoming infected with COVID-19.

179.    The JBS Defendants knew their representations were false.

180.    The JBS Defendants willfully and intentionally withheld their knowledge of COVID-19 infections at the JBS Iowa Plant.

181.    The JBS Defendants fraudulently misrepresented the risk of infection to other workers at JBS Iowa Plant to induce those workers to continue their employment at the JBS Iowa Plant.

182.    The JBS Defendants fraudulently misrepresented the risk of infection to other workers at the JBS Iowa Plant to induce those workers to continue making the JBS Defendants profitable.

183.    Workers at the JBS Iowa Plant, including Luciano Sican-Soloman, justifiably relied on the JBS Defendants' misrepresentations and continued to arrive for work each day, completely

unaware that other workers at the plant were infected with COVID-19 and/or were displaying

symptoms consistent with COVID-19.

184.    As a direct and proximate result of Luciano Sican-Soloman's reliance on the JBS

Defendants' misrepresentations, Luciano Sican-Soloman became infected with COVID-19 while

working at the JBS Iowa Plant and died.

**COUNT IV**
**WRONGFUL DEATH AND SURVIVAL ACTION (AGAINST THE JBS DEFENDANTS)**

185.    Plaintiffs hereby incorporate all preceding paragraphs of this Complaint by

reference.

186.    Plaintiff brings this wrongful death and survival action pursuant to Iowa Code

section 611.20, which keeps alive for the benefit of the estate the causes of action which the

deceased prior to his death could have brought had he survived the injury, with recovery enlarged

to include the wrongful death.

187.    All causes of action described and alleged in Counts I-III and V could have and

would have been brought by Luciano Sican-Soloman had he not died as a result of his fatal injuries.

188.    As the Administrator of the Estate of Luciano Sican-Soloman, Evelyn Sican is

statutorily authorized to bring a wrongful death/survival action on behalf of the Estate and recover

all damages allowed by law.

189.    As a result of Defendants' tortuous conduct, as described above in this Complaint,

Plaintiff seeks all damages for wrongful death/survival allowable under Iowa Code section

633.336.

**COUNT V**
**GROSS NEGLIGENCE (AGAINST JOHN DOES 4-7)**

185.    Plaintiffs hereby incorporate all preceding paragraphs of this Complaint by reference.

186.    At all relevant times, John Does 4-7 were Luciano Sican-Soloman's co-workers and supervisors at the JBS Iowa Plant.

187.    At all relevant times, and prior to Luciano Sican-Soloman contracting COVID-19 at the JBS Iowa Plant, Defendants John Does 4-7 knew that workers at the plant were infected with COVID-19 and/or potentially infected with COVID-19.

188.    Despite this direct and actual knowledge, Defendants John Does 4-7 actively concealed this information and risk of fatal injury to workers at the plant, including Luciano Sican-Soloman.

189.    Despite this direct and actual knowledge, Defendants John Does 4-7 forced workers at the plant, including Luciano Sican-Soloman, to continue to show up to work every single day.

190.    Defendants John Does 4-7 undertook these unconscionable, wanton, reckless, and grossly negligent acts knowing that workers at the plant, including Luciano Sican-Soloman were likely to contract COVID-19 at the plant.

191.    Defendants John Does 4-7 knew that if the risk of contracting COVID-19 was concealed from workers, those workers would continue to arrive for their shifts each day.

192.    Defendants John Does 4-7 knew that it was probable workers at the plant, including Luciano Sican-Soloman, were likely to contract COVID-19 at the plant if they were forced to work in the midst of a COVID-19 outbreak.

193.     In forcing workers to show up for their shifts each day in the midst of a COVID-19 outbreak, Defendants John Does 4-7 knew of the peril to be apprehended, namely workers contracting COVID-19, and yet consciously failed to avoid that peril.

194.     As a result of Defendants John Does 4-7's gross negligence, wantonness, and recklessness, Luciano Sican-Soloman contracting COVID-19 at the JBS Iowa Plant and succumbed to his illness.

### COUNT VI
### LOSS OF CONSORTIUM (AGAINST THE JBS DEFENDANTS)

195.     Plaintiffs hereby incorporate all preceding paragraphs of this Complaint by reference.

196.     At all relevant times, Evelyn Sican, Kimberly Acosta, Luis Sican, Jasmine Sican, and Glenda Sican were the children of decedent, Luciano Sican-Soloman.

197.     Evelyn Sican is the Administrator of the Estate of Luciano Sican-Soloman, and is therefore entitled to bring a claim for loss of consortium on behalf of all Luciano Sican-Soloman's children and beneficiaries pursuant to Iowa Code section 613.15.

198.     As a result of Defendants' tortuous conduct, as described above in this Complaint, Plaintiff and all of Luciano Sican-Soloman's children and beneficiaries seek all damages for loss of consortium as permitted under Iowa Code section 613.15.

**WHEREFORE**, Plaintiffs Evelyn Sican, Individually and as Administrator of the Estate of Luciano Sican-Soloman, deceased, Kimberly Acosta, Luis Sican, Jasmine Sican, and Glenda Sican, request that the Court enter judgment against Defendants in an amount that will fully and fairly compensate them for their damages and punish Defendants for their wrongful conduct, plus fees, costs, and interest as allowed by law, and all other such relief the Court deems proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all fact issues in this case.

Respectfully submitted,

*/s/ J. Barton Goplerud*
J. Barton Goplerud, AT0002983

*/s/ Brian O. Marty*
Brian O. Marty, AT0011622
SHINDLER ANDERSON GOPLERUD &
WEESE, P.C.
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa  50265-5749
Telephone:     (515) 223-4567
Facsimile:      (515) 223-8887
Email:           goplerud@sagwlaw.com
                    marty@sagwlaw.com

*/s/ Jeffrey P. Goodman*
Jeffrey P. Goodman
Jason S. Weiss
Aidan B. Carickhoff
SALTZ MONGELUZZI & BENDESKY
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: (215) 496-8282
jgoodman@smbb.com
jweiss@smbb.com

(*Pro hac vice forthcoming*)

*Attorneys for Plaintiff*